Okay, the next case on today's docket is the case of Kathryn Vanoosting v. Carl Sellars and we have Mr. Steve Stone for the appellant and Mr. James Blyer for the athlete. You may proceed Mr. Stone. Thank you. Good morning. May it please the court, Mr. Blyer. This case comes to you from Union County. I represent Kathryn Vanoosting. Kathryn lives just east of Cobden between the city center or the town center and Route 127 on about 21 acres of land. Before this wreck happened, she was single. She took care of that land. She took care of that house. She took care of her 90-year-old something parents who she had moved on to the land some years before. Some pictures and evidence, you can see that she was an avid woodworker, a very handy woman. In fact, her son testified in the case that compared to his father and his brother, she was the man of the house. So a very rugged woman. She worked in a grocery store called Arnold's Market in Carbondale, and that was her life. That was her normal life until Carl Sellers negligently drove his vehicle into the rear of her vehicle and hit it so hard that the vehicle she was in was barely recognizable. The impact propelled her, in fact, into the back seat. She had objective injury noted in the first visit to an urgent care center the next day, scratches, abrasions, swelling, and so forth. The doctor who initially treated her gave her medications, sent her for physical therapy, and she did that for a period of weeks until she asked that doctor for a release because just prior to this wreck, in an effort to be closer to her parents, to be able to take care of her parents, she quit her job at Arnold's because she was going to take a job as a substitute postal carrier for the post office. Unfortunately, before she could take that job, she had to have a clean bill of health, and so she obtained a release from her urgent care doctor, despite the fact that she was still treating with an expert dentist about a TMJ problem, and that expert dentist, within a matter of weeks of that early release, sent her back to physical therapy saying part of her problem was her neck, and so she went through physical therapy for her neck and her back for the rest of that summer until September of that year when the physical therapist said, let's try to advance you to a home exercise program. She tried that home exercise program for about a year, maybe a year and a half. She was still having difficulties, so she decided to go back to the doctor at the urgent care center. Urgent care won't take care of somebody on a chronic basis, so she had established with another doctor, and he sent her for some more physical therapy and actually a specialist for more testing. And then she gets to about the two-year anniversary of that wreck, and her treatment all but stops, with the exception of one follow-up visit that she said she paid for for herself, which the record reflects I think was about a $54 visit. So that was the case that we put on. Mr. Blyer, on behalf of Mr. Sellers, asked every doctor whether Katherine Van Oosting had been back to see that doctor or that specialist, whether it be the primary care physician or the neurologist or the dentist since this sort of two-year anniversary date, which was significant. And the doctors all said, no, I haven't seen her. And Mr. Blyer said, well, you've been available to see her, haven't you? The doctor said, we've been available to see her. We don't know what her status is. And he asked those questions with each of the doctors. He mentions it in an opening statement that this lady hadn't been to the doctor, folks, in three years, and you're going to see evidence, and I've asked all these doctors. She hasn't been back. And so I asked Katherine Van Oosting, why haven't you been back to the doctor? And in the second mistrial of this case, she said, because I don't have health insurance. And that was her reason for not going back to the doctor. And at that point, Judge Bowie declared a mistrial, saying that you can't say that. You can't say you don't have health insurance. So we went to the trial that brings us to this case. And I asked in limine this time. Weren't there two mistrials? The first mistrial, we had a juror stand up in the middle of my case in chief and declare he couldn't be fair anymore. And unfortunately, Judge Bowie was in a hurry that week. We didn't take the time to pick an alternate, and we lost out on a full complement of jurors. So that's neither here nor there. But other than the fact that Mr. Dwyer and I have a lot of practice with this case. And I think it's true. I mean, none of us are anxious to do this a fourth time, but it's just there's something we need to correct in the plaintiff's case. So in limine, in the trial that brings us here, I asked for permission. Let her say why it is that she hasn't been back to the doctor. Could she have said, I can't afford it? She could have. And the trial court said she could have said that? I don't know what the, I think what the trial court said was that he didn't want them to get into her assets and her liabilities and so forth. But she could have said something like that. But the reality is, her truth, her reasons for not doing it is, I don't have the truth. Isn't that the same thing as saying I can't afford it? If somebody else is paying for it, it's not. Yeah, I agree. And maybe she should have said it. But the point is, she can say her truth. And there's no policy that hurts the defendant for her to say, I don't have health insurance. And I think the reality is that there are a lot of people that don't have health insurance. But this is a woman who has 21 acres. I mean, I guess the argument could have been sell some acres. But a person in this state is entitled to a remedy for harm that's caused to them that isn't bad enough to sell off assets, but is bad enough that it bothers her day in and day out that she wants to go to the doctor as soon as she has the means to do it. And that was her truth. And she was not permitted to do it. She couldn't do it. So when it came up again, and understandably, when the plaintiff was handcuffed and says, well, you can't tell that. You can't say that. Then I asked, well, Catherine, without getting into why, you haven't been to the doctor in the last three years. Have you encountered certain obstacles that have prevented you from doing that? Objection sustained, and the jury is told disregard that. So not only is she not allowed to give her reason for not going to the doctor, she's not allowed to even say she has a reason for not going to the doctor. I mean, to say that she can't say she has obstacles that prevented her from going when the predominant theme of the defense is, how can you believe this woman is hurt when she hasn't been to the doctor in three years? How can you believe that she wants to go back to the doctor when she hasn't been to the doctor in three years? How can you say that this is that big of a deal when she hasn't been to the doctor in three years? And she's handcuffed. She's completely silenced by the rulings of the court, and I think it just deprived her of a fair trial. And I think the overlap of that, I mean, some of the arguments made, the jury didn't buy. There was a one-year gap in treatment in this case that was argued. But the jury gave her all of her medical bills that we claimed, even the early bills and the late bills, with a year in between. So they were clearly convinced that the year later she was still struggling with it. Now, the reality is what happened was she didn't have health insurance. She had insurance on the car she was in, MedPay. I think we're all familiar with that, which is kind of just no-fault insurance. But in her case, it lasted two years, and that's why the treatment stopped. She had a five-year policy that chances are she would have kept treating and would have treated more often. And that was part of my offer of proof. I threw her in the kitchen sink. Just explain everything that you've got as your rationale for not treating in the last three years. And when I did the offer of proof, none of it, none of it, including could you afford it, was accepted. None of it. When you said accepted, you got to put forth your offer of proof. Right. And that's in the record? Oh, yes. I did a very comprehensive offer of proof. And in the offer of proof, I said, you know, tell us, how much money do you make, Catherine? She said she makes $200 a week, I think, as a substitute postal carrier. Her parents, who are in their 90s, are both on Social Security. She takes care of them. She takes her meals with them. That's how modest her existence is. And she basically lives on $200 a week with a job that doesn't have health insurance, which is part of the offer of proof. And she is partly sustaining herself on her parents' Social Security. She cleans their house. She prepares their meals. But they buy the food. So it was part of an offer of proof. She couldn't even explain any of that. So, you know, you have, a person has to be able to give an explanation. It wasn't like this was part of our case in chief, where we came in and said, poor Catherine. She can't afford it, folks. I didn't bring it up. The defense brought it up in their opening and in cross-examination with every witness. I mean, it was a constant refrain. And then for her to be silenced as to why she hasn't been back to the doctor, I think it's deprived her of a fair trial. And the problem is, and I even asked the court in the post-trial motion, tell me the public policy that's being offended when she says, I don't have health insurance, I can't afford to go to the doctor in the last three years. Tell me what prejudice there is to the defense. I mean, how is the defense prejudiced by an explanation of something that the defense raises? There isn't any. But the notion that insurance was in the explanation, quite frankly, just, you know, it was like an atom bomb had dropped in the courtroom. It was as if that word in and of itself just can't ever be uttered. And I just don't think it's true. And, of course, the court has the benefit of limiting instructions. For example, you know, jury, you can consider it for this limited purpose, but not these other purposes. But we didn't, you know, we didn't get that far. I think there's overlap. The other problem I have with the case, of course, is that we got zero for loss of a normal life. The reason I started out my presentation here with an explanation factually of Catherine's normal life was to suggest there's not any contrary evidence. She went from having no doctor, no health insurance, no need to go to a doctor, four years. I mean, this woman built furniture, cut down trees. She tended a goat farm next door. She took care of her parents. She drove to Arnold's Market and back every day. This is a very healthy woman. How old was she? She was 56, I think, at the time. And so, you know, she's got two grown boys. She's got a husband. Unfortunately, their marriage fell apart, and he's gone. And this used to be their homestead. And she's taking care of it all. And as I say, she built furniture. She built cribs. She did a lot of woodworking. There was testimony in the record. The house that they bought years before was, like, built in the 1840s or something. And she restored it herself with her son saying, Mom did most of the work. I mean, so she then goes to a life of no doctor to a doctor, no physical therapy regimen, no home exercise program to sustain her back to one where she has to do that. And she said, I can't do the same things as well or it takes me long. And that's uncontradictory. And yet she gets a zero for loss of a normal life. And I understand there are cases that say that a zero can be sustained, that a jury has discretion to do it. But there has to be evidence in the record supporting zero. And there just isn't. And so if you look for an explanation, well, why did this happen? Well, in part, she's got this big gap in her testimony, which is, how can you claim a loss of a normal life when you haven't been to the doctor in three years and there's no explanation? And then you have, unfortunately, the argument made, the closing argument, which is pain and suffering and loss of a normal life are double-dipping. It's the same thing because it was her pain that was limiting her function. And she said, yeah, I'm limited by my pain. But the law says these are two distinct elements of damage. When isn't loss of a normal life caused by pain? I mean, in almost every one of these cases, a loss of a normal life is some painful condition, and sometimes it's you've lost your leg. Mr. Blyer, you know, years ago had a case where a kid did lose his leg and they said there was no pain, but that case was reversed and we tried again. So, you know, when you have really uncontradicted evidence that her life was altered, and then you have, quite frankly, someone who has the presence in a courtroom that Mr. Blyer has that says to the jury, this is double-dipping, folks. It's the same thing. And I object. And the court doesn't sustain my objection. I thought that in your brief you said there wasn't a ruling? Well, what the judge says was, well, he didn't sustain it. He didn't overrule it. He said, well, I could see where that might be confusing or something to that effect. He didn't rule it. I mean, he said something. He gave commentary, but he didn't say sustained and he didn't say overruled. And when Judge Bowie was done saying, well, this could be confusing or something, Mr. Blyer said, no question about it, double-dipping. It's a slang term. Maybe I shouldn't use it. But juxtapose that ruling with the ruling of, Catherine, have you encountered certain obstacles? Objection sustained, and don't you consider that? You disregard that evidence. I mean, there's a fundamental difference in the rulings there. And when a court says to the jury in this trial, there's something you should disregard, and I'm telling you to disregard it. And then when an advocate says, in my judgment, misstates the law, that pain and suffering and loss of a normal life are double-dipping, and it clearly isn't, and I think this court should make this case the case that says that because I'm afraid it will happen again. And the judge doesn't really with the same oomph or same vigor tell the jury that's wrong. And it wasn't. And then to say, well, it's cured by the mundane reading of jury instructions, which I don't think cures anything. So, as I say, I'm not anxious to try a case for the fourth time, but I do think that fundamental fairness requires Catherine to have an opportunity. If she's going to be in a case where it's stated over and over again, you haven't been back to the doctor in three years, she's got to be able to say what her truth is.  Thank you. Thank you, Mr. Stone. You'll have the opportunity for rebuttal. Mr. Blyer? May it please the court? Yes. I'm James Blyer, on behalf of the defendant of this case. I've listened to Mr. Stone, and a great deal of what he said is true with regard to the genesis of this case. I've tried cases for many years, maybe too many, and I've tried them once, several times. I've tried them twice, a few times. This is the first time I've ever tried it a third time, and I guess it'd be a world record if we tried it the fourth time. But this was kind of strange. Was it the same judge all the three times? Same judge. Same judge. We didn't have the same jurors, but we almost did in Eugene County. But what was so strange about this case, I've never seen this happen before, and yet I'm sure it happens all the time. The first case, we're going along very well, and one of the jurors says I got to talk to the judge, and he says I've already made up my mind that this person's not hurt. Well, my guess is that 90% of the jurors, after they hear the opening statement, have pretty well got their minds made up. But this guy, this gentleman, I should say, if he had just kept his mouth shut, everything would be fine. Everything would be fine for you, probably. Well, Mr. Stroll moved to the mistrial there, and I wanted to go ahead. Then the second time, we had the insurance problem. The third time, I say the jury got it right. Now, this question of insurance, Mr. Stroll harps and harps and harps about the fact, why didn't she go back to the doctor? Well, couldn't it be because she wasn't hurt, that she didn't have any need to go to the doctor? I say this to you, if she'd been hurting, and I can relate this personally, you would sell the farm if you had to. You could sell your mother's china. Yeah, but she doesn't even get to get to that point to say that's why she doesn't go back, is because she can't afford it. Well, Your Honor. And if she had said that, then the jury could decide whether or not that was a legitimate rationale. Well, she wasn't about to say she couldn't afford it. She wanted to say, the first time she wanted to say she had agreed and she didn't go back, she had no health insurance. And, in fact, the matter is she did have health insurance for two years, and we didn't go into the fact that Country Mutual paid $18,000 of her medical bills. What would they have thought if I had jumped up and started off with, well, don't pay her medical bills, some insurance companies already paid it. Where would we have been then? You know, it's kind of ironic. Mr. Stroll talks about the insurance, and he tendered the instruction. He tendered it. Actually, I objected to it, the instruction about insurance. And, you know, this was kind of a new thing, this insurance instruction. It used to, until you had insurance mentioned, you didn't instruct the jury. Now then, the better view, they say, is to give insurance in any cases. And one of the IPI comments says, the committee believes that this instruction should be given in all cases where insurance could play a role in the decision of the jury. With the wide prevalence of liability insurance, medical insurance, of government benefits such as Medicaid or Medicare, many jurors question the role of insurance in contested accidents, medical negligence, or other cases. What is the instruction? Whether a party is insured or not insured has no bearing on any issue that you must decide. You must refrain from any inference, speculation, or discussion about insurance. If you file for the plaintiff, you shall not speculate about or consider the possible source of benefits the plaintiff may have received or might receive after you return to your verdict. The court will make whatever adjustments are necessary in this regard. That was the instruction Mr. Stroll submitted to the court. I objected. The court gave it. The jury was instructed. Don't pay attention to insurance. Now what can you give them that and then talk about insurance? Okay, let's leave the insurance issue aside. Could she have given an explanation without using the word insurance that related to her inability to financially afford it? Well, I don't know. Well, Mr. Stone states that the court in the offer of proof has said that I won't allow any explanation that goes into whether or not she was able financially to pay for her doctor. We didn't get that far. I mean, that never came up in that fashion. She did pay for insurance. She did pay for a doctor's visit after insurance. She did go to the doctor after she didn't have insurance. That's what's kind of ironic. She went two or three months after her insurance expired because she had insurance. I mean, excuse me, two or three months after her insurance expired. She had no insurance. She went to the doctor. She paid for it. But I guess her explanation could be at some point I could no longer afford it, and that wouldn't get into the question of the impermissible insurance. But, you know, this whole thing, you've got a slippery slope, and that's the whole thing about insurance. Let's say they said, then am I going to get to ask, well, you had $18,000. All your bills have been paid. Do I get to ask that? We didn't get to that. I mean, if they get to say, well, she didn't go back because she didn't have insurance, then do I get to say, well, you had insurance for those other things. Did you go because you had insurance? You're just creating a slippery slope that there's no – you get into all kinds of things. Then we get into her financial condition. Did she have assets? And that's another thing. If we could have got into her financial assets, if she said she – if we got into the fact she had no insurance, well, if you had no insurance, you've got a 20-acre farm. You've got – we didn't go into it. I didn't see her tax returns. They didn't claim any lost income. So we don't know what her situation would have been had that happened. But, as I say, you've got a situation here. Once you open the door, there's no end. How much was medical – how much of her insurance was paid by medical insurance? How much of her bills? How many of her bills? Did she go back one time? She had money to do with that. You know, let's face it. I ask the question because I'm actually an advocate. I want to show that she didn't go back because she didn't need to go back, and I think that could very well be a reason. That could be one reason. That doesn't have to be the only reason. If she didn't go back because she didn't need to go back, the jury could consider that. Now, if that's wrong, it's wrong. Mr. Stone talks about that I have the benefit of a sacrament of reconciliation, which he's true about that, but I don't need it for that. I think that's proper to go into the fact that one of the reasons she – the jury can suspect that one of the reasons she didn't go back is because she didn't need to go back. I think it's certainly permissible to argue that. But then does that preclude her from an explanation that negates that argument? What's she going to say, I didn't have the money? Well, apparently that is what she was going to say. Then I'm going to have to say, well, let's talk about how much money you got. Well, I guess you could. Well, then we get her tax returns. Then we have to see how much she earned, how much asset she has. The jury could reject all that. Say that it's bogus. It didn't come up until – I don't know how harsh it was out on the barn, I guess you'd say, but in my position it's very simple. I brought that up to show that she didn't go back because she didn't need to go back. They brought up the fact she had no insurance. That's only one reason. It could have been another. It could have been she didn't need to go back. She didn't want to go back. Nobody likes to go to the doctor. I mean, it could have been another reason. That's what the jury is for, to determine what the reason is. Now, that's my take on it. Now, as I say, this instruction, what did the instruction mean? Why did he want to give the instruction? They grew the dirty picture. They're the ones that gave the instruction. I didn't give an offer about don't consider insurance, don't consider – that's not an issue whether they got insurance. That's what the instruction said. Whether they have insurance is not an issue. And now they're arguing about the insurance is an issue. Now, what is it? Now, on the loss of normal life, if there's anything that jurors don't understand, it's loss of normal life. I've talked to a lot of jurors, most of them. If they put a zero in, it's generally on the – Do you think double dipping is an accurate statement of the law, Mr. Plyer? Well, Your Honor, I don't think so. With respect to those two instructions which the plaintiff has a right to give together. Well, you know, I didn't have the benefit of a Harvard education. My language – I didn't either. Your language. And where I went to school, we talked about other things. But anyway, double dipping is – you know, I could use all kinds of terms. It really is – it's a way of saying you're trying to overreach. Maybe double dipping. Maybe get something you're not entitled to. What's that? Maybe get something you're not entitled to. Well, Your Honor, if the jury determines – and she said that the thing she couldn't do was because of her pain. Now, do you give them pain and give them that too? If you're on the jury, what do you do? She said, well, the reason I can't do that is because I've got pain. Well, do you give her so much for pain and give her that too? And, you know, the Snover case says there's got to be some evidence other than the plaintiff's subjective testimony. And there was no doctor testified that she couldn't do these things. She and her son testified. It doesn't pass the smell test on Snover. And the Supreme Court said, if you look at the Snover case, that zero is probable. Now, whether double dipping – you know, I'm not an English major, but double dipping means to me – and I'll guarantee you I've seen a lot of arguments. And the one argument, as I mentioned in there, one I argued in this case 45 years ago where they raised pain about the fact that the final argument, you saw what the court said, advocacy requires maybe, you know, I don't know, strident comments or whatever you want to call it. I don't see double dipping. You may see it differently. I think it means simply that you're trying to get paid twice double the same thing. And I believe that's probable. Now, whether it is or not, I don't get to decide at this point. But this – you know, I don't know whether I won or lost this case. I mean, they got a verdict, and they got a substantial verdict. And I think that the court – you know, it's easy to sit here and you go to Union County. The ceiling fell down the other day. I mean, it's not exactly the Taj Mahal. We're sitting there. That jury hears their evidence. They hear the – they talk to the judge. They talk to the lawyer. The jury decided this case. They decided it based on the evidence. I think the verdict should be affirmed. I hope. Thank you, Mr. Blyer, for your argument. Mr. Stone? So you're willing to roll the dice? Yes. I mean, as I told you, I'm not a big fan of trying it four times. But you don't have much choice if you win. Yeah, that's true. That's true. But, you know, my – sometimes it's easier to practice law when you don't have clients. But my client's disappointed with the result, and she wanted to speak her truth. And she didn't get to. Let me address a couple of things, please. IPI 3.01, I tendered it. He's right. I tendered it in the case that I got based on the rulings I got. If I had had different rulings, I would have tendered some different version of this. I have to tender IPIs. I do have a collateral source issue in the case I got to try. If she had been able to give her explanation, any part of her explanation in the offer of proof, which, by the way, is in transcript 243 to 253, if you're honest, if she had been able to use any part of her offer of proof where maybe the fact that she had insurance for two years and then it expired, if that had come up, well, then it's obviously a collateral source issue. But instructions, we can deal with that stuff. And, you know, I have been in cases where judges have ruled that the collateral source rule protects the plaintiff and the plaintiff can waive it if he or she wants to. You know, in other words, you can say, yeah, I can put it in myself because sometimes the obligation to pay money back is in a case. It's not in this one. So, I mean, I don't think I can be criticized for tendering an instruction for the case I had. I think it was appropriate for me to tender that instruction based on the evidence that I got in. If I had got in other evidence, I may have done something different. So, I don't think I can be criticized after the fact. It's a little bit unfair, I think. With regard to double dipping, if I have a headache and I experience pain, that's an element of damages. If I have a migraine and I experience pain and it keeps me from working, I'm entitled to an element of damages for pain and I'm entitled to lost wages if I've lost wages. Those are two separate elements of damages, equally compensable, all with their origin in pain. If, because I have a headache, I have pain and then I miss a day's work, and in addition to not working, I also don't build my granddaughter or baby crib that I've been working on, and that's how I derive joy and pleasure, and that's how I participate in my family life, and I just can't do it. I can't stand the sound of the saw or whatever, and I don't do it. Then I've missed out on some pleasurable aspect of life, which is how loss of normal life is defined. Now, Illinois says those are three distinct elements of damages with their origin in pain. And, you know, as I say, I just thought it was, I don't think it's double dipping. And when you have a case like this one, I mean, all I have to do is to prove that she probably lost a normal life, or her enjoyment of life. It only has to be probably true. The burden is very small. The evidence is overwhelming that her life was substantially altered from a healthy existence to a non-healthy existence. Even if you talked about, don't even talk about forever, just talk about the six weeks that she went from, you know, having a car demolished to having to go to the doctor and doing those things for six weeks, having to go to physical therapy and do those kinds of things. That is a life that is altered where she didn't get to do something. That has a value. And so is there support in the record for giving her nothing? Well, I don't think there is. Is there an explanation for why this jury might have given her nothing? Well, we know that we have, you know, someone who's got an enormous presence in a courtroom telling them, hey, this is the same thing. She's overreaching. She's not supposed to have this. And unfortunately, a judge who didn't sustain the objection. You know, and lastly, I just want to point out with regard to, you know, one of the reasons that she didn't go back to the doctor might be that she's not. That could be a reason. A jury could infer that from the evidence, but they didn't get to hear all the evidence. They didn't get to hear her explanation. And in fact, when she merely tried to say, I've encountered obstacles, I mean, how neutral a word can that be? I just, I've encountered obstacles that the judge says, no, you can't do that either. I think at that point she just was deprived of a fair trial because there just wasn't a balance of evidence to be weighed on. So I'd ask you to reverse and remand. Thank you. Thank you, Mr. Stone. Thank you, Mr. Bleier, for your arguments. We'll take the honor of your five-minute and render ruling.